[Nos. 60411-8; 60879-2; 60880-6. En Banc. April 21, 1994.]

CATHERINE LEEPER, *Respondent*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Petitioner*.

DONALD TAASEVIGEN, *Respondent*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Appellant*.

JANICE M. JONES, *Respondent*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Appellant*.

804

*Christine O. Gregoire, Attorney General,* and *Gayle Barry* and *Nancy Thygesen Day, Senior Counsel,* for the State.

*Counsel, Murphy & Bottiger, P.S.,* by *John P. Murphy,* for respondent Leeper.

*David B. Vail & Associates,* by *Todd R. Renda,* for respondent Taasevigen.

*Small, Snell & Weiss,* by *Richard E. Weiss,* for respondent Jones.

*John D. Fairley* on behalf of Washington Self-Insurers Association, amicus curiae.

*Gary N. Bloom, Bryan P. Harnetiaux,* and *Michael J. Pontarolo* on behalf of Washington State Trial Lawyers Association, amicus curiae for respondents.

GUY, J. — We here decide whether evidence of a worker's inability to obtain employment is relevant to determining if an injury has left a worker permanently and totally dis-

abled. In 1989, the Washington Supreme Court Committee on Jury Instructions added the phrase "or obtain" to the pattern instruction which defined permanent total disability in workers' compensation cases. The previous edition of the instruction defined total disability as a medical condition that made a worker "unable to perform a gainful occupation". 6 Wash. Prac., *WPI* 155.07 (2d ed. 1980). The third edition now reads "unable to perform *or obtain* a gainful occupation". (Italics ours.) 6 Wash. Prac., *WPI* 155.07 (3d ed. 1989). In these three consolidated appeals, the Department of Labor and Industries (Department) argues this revision was inappropriate and contends WPI 155.07 (3d ed. 1989) misstates the law. We conclude the instruction is correct and affirm the verdicts of the trial courts.

## BACKGROUND

### Catherine Leeper

In each of the three cases now before us, a jury found the injured worker permanently and totally disabled. The first claimant, Catherine Leeper, worked as a licensed practical nurse on an acute psychiatric ward at Western State Hospital. Twice she was hurt on the job, once in 1980 and once in 1984, the subject of this claim. In December 1980, a combative patient kicked Ms. Leeper in the face, injuring her jaw, left shoulder, and neck. After receiving workers' compensation for her lost time, she returned to Western State as an LPN. On June 13, 1984, Ms. Leeper reinjured her neck while acting as union shop steward in a personal conduct hearing. A supervisor had complained a health assistant pulled a patient's hair and, apparently to demonstrate what had happened, the complaining supervisor without warning grabbed Ms. Leeper's hair at the nape of her neck and yanked her head backward. Ms. Leeper immediately felt pain in her neck, then a severe burning sensation, and her neck stiffened.

After 6 weeks of recuperation and physical therapy, Ms. Leeper started work at the hospital's library. Her treating physician, Dr. H. Richard Johnson, had ruled out her return

to nursing duties. In December 1984, Ms. Leeper resigned from her job in the library after she contracted meningitis from the chemical dye used in a diagnostic CAT scan. Because Ms. Leeper's injuries prevented her from resuming her duties as a nurse, on April 7, 1985, Western State gave Ms. Leeper a disability separation. Since her injury, Ms. Leeper has suffered from pain in her neck and shoulders. She also has not worked since her termination.

Donald Taasevigen

The second claimant, Donald Taasevigen, had a difficult start in life. At age 4, Mr. Taasevigen joined his older brothers in his first robbery, and Mr. Taasevigen spent half of his teenage years in reform school. Mr. Taasevigen then spent nearly 25 years of his adult life behind bars, serving sentences for various burglary convictions and for growing marijuana in his home. During Mr. Taasevigen's last prison term, in Bismarck, North Dakota, he talked extensively with a deputy warden and a prison chaplain who successfully counseled him to stay out of prison. From his release in 1977, Mr. Taasevigen has not had any further arrests or criminal charges filed against him.

In January 1979, Mr. Taasevigen began work as an attendance counselor for the Rainier School in Buckley, Washington. He worked directly with the residents of the school, mentally disabled individuals, and at times Mr. Taasevigen had to restrain residents who became disruptive. His prior experience consisted of odd jobs held between prison sentences. On April 30, 1980, Mr. Taasevigen injured his middle and lower back at the Rainier School and lost approximately 7 months of work. Some 20 years earlier, Mr. Taasevigen had hurt his lower back unloading plumbing supplies from a boxcar and this 1980 injury aggravated his back pain and lack of mobility. The Department granted Mr. Taasevigen a permanent partial disability award of category 5 and closed his 1980 claim.

In November 1980, Mr. Taasevigen returned to the school as an attendance counselor, receiving two promotions dur-

ing the next 2 years. On June 27, 1982, while Mr. Taasevigen attempted to restrain a violent resident, the resident threw him over a settee, damaging Mr. Taasevigen's back, neck, and shoulders. Dr. John Mullins, a neurologist, assessed the damage as moderate limitation in Mr. Taasevigen's ability to move his neck and moderately marked limitation in his ability to move his lower back. Since this accident, Mr. Taasevigen has not worked.

### Janice Jones

From 1972 through September 20, 1984, Janice Jones, the third claimant, climbed the ranks in the grocery business. She started as a checker and, after a series of promotions, became assistant manager and then manager of a store. Her work ended on September 20, 1984, when a 50-pound bale of flour slipped from her hands and fell on her leg, twisting her back. She immediately felt pain in her back, and then her legs went numb. Ms. Jones' treating physician, Dr. Walter Arthur, diagnosed a lumbosacral strain and prescribed a course of physical therapy. Some weeks later Ms. Jones returned to her store, against her doctor's orders, and tried to resume work as an assistant manager. She labored for several days before the pain in her back became too severe to continue. She has not worked since.

After filing their claims, Ms. Leeper, Mr. Taasevigen, and Ms. Jones (claimants) all received similar decisions in their disability determinations. The Department closed the claimants' cases without finding permanent total disability. The claimants then appealed to the Board of Industrial Insurance Appeals (Board) and the respective industrial appeals judges affirmed the denial of benefits. On appeal of the judges' decisions, the Board also denied benefits to the claimants. All claimants made separate appeals to the Superior Court for Pierce County.

In each case before the Superior Court, the jury found the claimant totally and permanently disabled. The trial judges instructed the juries on the definition of total permanent

disability using the third edition of WPI 155.07, rather than the second edition which the Department had requested. The Department filed separate appeals of the adverse jury verdicts, and in Leeper's case the Court of Appeals affirmed the verdict in an unpublished opinion. We accepted discretionary review of the case and consolidated the other two cases for review.

ISSUES PRESENTED

The Department's appeal presents two interconnected issues: First, is proof of an injured worker's inability to obtain employment relevant evidence of permanent total disability; and, if so, second, did the trial courts in these cases err by instructing their juries that it was relevant evidence?

ANALYSIS

██ The Department challenges one jury instruction in each case, WPI 155.07 (3d ed. 1989), the definition of permanent total disability. We review instructions in accordance with the following decisional law:

> The number and specific language of the instructions are matters left to the trial court's discretion. The test for the sufficiency of instructions involves three determinations: (1) that the instructions permit the party to argue that party's theory of the case; (2) that the instruction(s) is/are not misleading; and (3) when read as a whole all the instructions properly inform the trier of fact on the applicable law. No more is required.

(Footnotes omitted.) *Douglas v. Freeman*, 117 Wn.2d 242, 256-57, 814 P.2d 1160 (1991). The Department contends inserting the phrase "or obtain" into the definition of permanent total disability substantially misstates the law governing these claims for workers' compensation. In essence, the Department argues the instruction did not properly inform the trier of fact on the applicable law, the third part of the test for sufficiency.

We begin our analysis with the definition of permanent total disability given in the industrial insurance statute:

"Permanent total disability" means loss of both legs, or arms, or one leg and one arm, total loss of eyesight, paralysis or other condition permanently incapacitating the worker from performing any work at any gainful occupation.

RCW 51.08.160. The Department contends the statute clearly and unambiguously defines disability as the inability to perform work. Nowhere, according to the Department, does the statute mention the inability to obtain work.

Our opinions have not read the statute so narrowly. More than 50 years ago, this court recognized the statutory definition of disability was ambiguous and required judicial interpretation. In *Kuhnle v. Department of Labor & Indus.*, 12 Wn.2d 191, 120 P.2d 1003 (1942), the court first wrestled with the meaning of total disability and, as a result, established the framework for all future decisions on this issue. Albert Kuhnle worked as a hook tender for the Simpson Logging Company until he suffered fractures of his sixth and seventh vertebrae, or "in nontechnical language, a broken neck". *Kuhnle*, 12 Wn.2d at 193. After his injury, Kuhnle watched over the family farm with the substantial help of his wife and eight children. The Department's doctors estimated Kuhnle's disability at 75 percent of a total award.

This court in *Kuhnle* acknowledged the difficulty of precisely defining disability.

> The courts have found great difficulty in defining what is meant by incapacity to perform any work at any gainful occupation, and equivalent expressions used in workmen's compensation acts. They agree that they do not mean that the workman must be absolutely helpless or physically broken and wrecked for all purposes except merely to live.

*Kuhnle*, 12 Wn.2d at 197. More recently, the Court of Appeals has held that a trial court must explain total disability to the jury in greater detail than simply reading the statutory definition.

> Instructing a jury on the meaning of total and permanent disability solely by reciting the statutory definition of that term is inadequate. A total disability instruction should be based upon the explanation of that term contained in *Kuhnle v. Department of Labor & Indus.*, 12 Wn.2d 191, 120 P.2d 1003

(1942) and *Fochtman v. Department of Labor & Indus.*, 7 Wn. App. 286, 499 P.2d 255 (1972).

*Buell v. Aetna Cas. & Sur. Co.*, 14 Wn. App. 742, 744, 544 P.2d 759 (1976).

■ The term "total disability" requires explanation. The reason for this is in the statute itself. The statutory definition combines categories of *per se* total disability, *e.g.*, loss of both legs or arms, with a general standard for determining disability — a "condition permanently incapacitating the worker from performing any work". RCW 51.08.160. We use the word "standard" advisedly. The language of the statute acknowledges proof of a disability will evolve with the development of new industries, the sophistication of medical diagnoses and treatment, and the changing composition of the labor market. When the Legislature enacted the workers' compensation program in 1911, it did not forever limit eligibility to the prevailing notions of disability. The Legislature adopted a standard, subject to interpretation and development, which the Department, the Board of Industrial Insurance Appeals and the courts have delineated case by case.

This standard for total disability covers workers who cannot obtain employment because of a workplace injury. We first reached this conclusion in *Kuhnle.*

> The purpose of the act is to insure against loss of wage earning capacity. A workman's wage earning capacity may be completely destroyed, though he still has some capacity to perform minor tasks. To quote from the opinion of the supreme court of Minnesota in *Green v. Schmahl*, 202 Minn. 254, 256, 278 N. W. 157 [(1938)]:
>
> "Furthermore and important, sporadic competence, occasional, intermittent, and much limited capacity to earn something somehow, does not reduce what is otherwise total to a partial disability. The statutory phrase 'working at an occupation which brings him an income,' like that of insurance 'following any occupation,' implies at least a reasonable degree of continuity of occupational capacity."
>
> The mere fact that the workman owns a small business or a farm from which he is able to derive some income by supervising the work of others or performing minor tasks himself, does not necessarily prove that he has wage earning capacity. To

quote the language of the Kansas supreme court in *Moore v. Peet Bros. Mfg. Co.*, 99 Kan. 443, 162 Pac. 295 [(1917)]:

"The phrase quoted does not imply an absolute disability to perform any kind of labor. It requires a practical and reasonable interpretation, as is illustrated by the familiar rule that inability to obtain work, caused by an injury, is classed as total incapacity. . . ."

*Kuhnle*, 12 Wn.2d at 197-98.

Much of this decision has its roots in the *Kuhnle* opinion. That ruling established the measure of total disability is not the extent of physical impairment, essentially a medical question, but rather the effect of the injury on the worker's "wage earning capacity". This is an inherently practical standard. To determine a worker's wage earning capacity, the Department must look both at the medical evidence of impairment *and* the empirical evidence of the claimant's ability to obtain a job. *Kuhnle* explicitly endorsed a standard of disability which incorporated proof of a claimant's inability to obtain a job, so long as the workplace injury *caused* the inability to obtain work.

The cases that followed *Kuhnle* reinforced its practical bent. In *Fochtman v. Department of Labor & Indus.*, 7 Wn. App. 286, 499 P.2d 255 (1972), the Court of Appeals first approved the now universal practice of using vocational experts to assess a claimant's disability or, as the *Fochtman* court named it, the worker's "employability". *Fochtman*, 7 Wn. App. at 288. The Court of Appeals contrasted the evidence necessary to prove a partial disability, medical testimony on the amount of loss of bodily function, with the evidence necessary to prove total disability.

There is a different quantum and character of proof in a total disability case. Total disability is inability, as the result of a work-connected injury, to perform or obtain work suitable to the workman's qualifications and training. Total disability is not a purely medical question. It is a hybrid quasi-medical concept in which there are intermingled in various combinations, the medical *fact* of loss of function and disability, together with the inability to perform and the inability to obtain work as a result of his industrial injury. A workman may be found to be totally disabled, in spite of sporadic earnings, if his physical disability, caused by the injury, is such as

to disqualify him from regular employment in the labor market. Indeed, if the injury has left the workman so disabled that he is incapable of becoming a workman of acceptable capacity in any well-known branch of the labor market — if his capacity to work is no longer a merchantable article in the labor market—it is incumbent upon the department to show that such special employment can, in fact, be obtained by him. *Kuhnle v. Department of Labor & Indus., supra*; 2 A. Larson, The Law of Workmen's Compensation §§ 57 and 57.71 (1971).

Proof of permanent total disability is more individualized than proof of permanent partial disability. The testimony necessarily requires a study of the whole man as an individual — his weakness and strengths, his age, education, training and experience, his reaction to his injury, his loss of function and other relevant factors that build toward the ultimate conclusion of whether he is, as a result of his injury, disqualified from employment generally available in the labor market. In the ultimate determination of whether the injured workman can maintain gainful employment in the labor market with reasonable continuity we find the testimony of a vocational or employment expert both relevant and admissible. *See Lee v. Minneapolis St. Ry.*, [230 Minn. 315, 41 N.W.2d 433 (1950)].

Traditionally, total disability cases have been proved by lay testimony of the injured workman and fellow employees, together with medical testimony as to the *facts* of loss of function and disability as well as the doctor's *conclusion* that the injured workman is totally permanently disabled. We do not disagree with that method of proof, but we do question whether most doctors are familiar with intricacies of the labor market.

*Fochtman*, 7 Wn. App. at 294-95. The Court of Appeals then approved admission of testimony showing the claimant was "not employable in the competitive work market". *Fochtman*, 7 Wn. App. at 298. The court in *Fochtman* accepted proof of the inability to obtain employment, caused by a workplace injury, as relevant evidence of total disability.

Two later cases reconfirmed the relevance of this evidence. In *Spring v. Department of Labor & Indus.*, 96 Wn.2d 914, 640 P.2d 1 (1982), the court, in both the majority and one of the dissenting opinions, assumed without comment that evidence of the claimant's inability to obtain work because of a workplace injury was proof of total disability. The majority noted, "Spring met the burden of proving that he could not obtain and maintain employment of a *general* light and/or

sedentary nature." *Spring*, 96 Wn.2d at 919. Justice Dolliver's dissent recited this assertion:

If the employee or the claimant can do light work of a general nature, then the presumption is that his inability to obtain employment is due to fluctuations in the labor market and is not due to the consequences of the accident. In that circumstance the burden is on the claimant to show there is no work he can obtain.

*Spring*, 96 Wn.2d at 921 (Dolliver, J., dissenting) (quoting *Spring v. Department of Labor & Indus.*, unpublished opinion noted at 28 Wn. App. 1034 (1981)).

In the second confirming case, *Washington Irrig. & Dev. Co. v. Sherman*, 106 Wn.2d 685, 724 P.2d 997 (1986), the court decided claimant Sherman's jury instruction on the test for total disability correctly embodied the law. That instruction stated,

The test for total disability requires a study of the whole person as an individual — their weaknesses and strengths, their age, education, training and experience, their reaction to the injury, their loss of function, and any other relevant factors that determine the question as to whether he or she is, as a result of the industrial injury, disqualified from *obtaining or performing employment* generally available in the labor market.

(Italics ours.) *Sherman*, 106 Wn.2d at 693. The court decided the trial court's decision to use WPI 155.07 (2d ed. 1980) rather than Sherman's proposed instruction was not in error. Both instructions correctly embodied the law, and the trial court therefore had the discretion to choose the instruction more appropriate to the particular case. *Sherman*, 106 Wn.2d at 694.

■ We draw three general conclusions from these cases. First, the purpose of workers' compensation, *and the principle which animates it*, is to insure against the loss of wage earning capacity. Adherence to this principle focuses disability hearings on the particular claimant's ability to work in the competitive labor market.

■ Second, the appropriate measure of disability requires a study of the whole person — weaknesses and strengths,

age, education, training and experience, reaction to the injury, loss of function, and other factors relevant to whether the worker is, as a result of the injury, disqualified from employment generally available in the labor market. *See Fochtman*, 7 Wn. App. at 295. The trier of fact must determine from all relevant evidence whether an injury has left the worker totally disabled.

■ Third, our opinions require a claimant to show the workplace injury, not fluctuations in the labor market alone, caused the inability to obtain work. If the claimant shows the injury in some part caused the inability to obtain work, then the failure to obtain work is relevant evidence of total disability. Proof of this causality comes not only from the circumstances of the claimant's attempts to seek employment, but also from the reasonable inferences arising from the medical and vocational evidence.

The Department contends, however, *Kuhnle* and the cases which follow establish that a claimant's inability to obtain work is relevant only in "odd lot" or special work cases. The court in *Kuhnle* concluded its opinion by adopting the odd lot doctrine. Under this rule, a claimant must prove he or she is incapable of performing light or sedentary work of a *general* nature. If the claimant proves this, the burden of proof shifts to the Department, and it must show odd jobs or special work exist in the local labor market that the claimant could obtain. *Kuhnle*, 12 Wn.2d at 199. According to the Department, evidence of the inability to obtain work is irrelevant to determining disability unless the odd lot doctrine applies.

The Department's argument confuses the burden of proof with the admissibility of evidence. The odd lot doctrine shifts the burden of persuasion to the Department once the claimant has made a prima facie case of disability. *See Spring*, 96 Wn.2d at 925 (Utter, J., dissenting). The doctrine does not, however, limit the evidence which a claimant may use to prove total disability. Many, if not most, workers' compensation cases begin with claimants testifying they could not return to their former job. The inability to obtain

work because of a workplace injury is relevant evidence at all stages of a disability hearing.

The Department's other arguments against the use of WPI 155.07 (3d ed. 1989) do not survive close scrutiny. The Department claims the Legislature's rejection of House Bill 2969 in the 1990 regular session implicitly rejects the addition of "or obtain" to the definition of total disability. House Bill 2696 proposed amendments to five separate sections of RCW Title 51, four of which had nothing to do with proving disability. Because the Legislature could have rejected the bill for any number of reasons, the vote is not evidence of legislative intent.

The Department also cites *Nash v. Department of Labor & Indus.*, 1 Wn. App. 705, 462 P.2d 988 (1969), for the proposition obtaining employment is not the appropriate standard for determining disability. In *Nash* the claimant's doctor concluded, "it would be impossible for [Nash] to obtain gainful employment on a continuous basis." *Nash*, 1 Wn. App. at 707 n.1. The court noted, "Dr. Gray's second statement insofar as it uses the word 'obtain' would appear, on its face, to be insufficient to support a rating of total permanent disability as the word 'obtain' does not reflect the statutory standard." *Nash*, 1 Wn. App. at 709. However, the court did not dismiss Nash's claim; it remanded the case to the trial court.

> Although the use of the word "obtain" was improper, the jury should be permitted to determine, in the context in which it was used, whether the doctor meant "perform." If the jury determines "perform" was intended, the use of the word "obtain" does not nullify the consideration of this question and answer by the jury on the issue of whether back injury alone rendered the claimant totally and permanently disabled.

*Nash*, 1 Wn. App. at 709-10. Cases subsequent to *Nash* have clarified that a claimant need not rephrase the inability to obtain work as the inability to perform work. *See Fochtman v. Department of Labor & Indus.*, 7 Wn. App. 286, 292, 499 P.2d 255 (1972); *Spring*, 96 Wn.2d at 920; *Sherman*, 106 Wn.2d at 694.

The Department's final argument, unemployment compensation rather than workers' compensation protects workers who cannot obtain employment, fails to account for those workers who cannot obtain employment because of a workplace injury. Because these individuals are not "able to work", they are not eligible for unemployment compensation. *See* RCW 50.20.010(3). The requirement of causality — the injury caused the inability to obtain work — ensures the evidence is relevant to proving total disability rather than general fluctuations in the labor market. This requirement also separates eligibility for workers' compensation from that for unemployment compensation.

We hold, therefore, WPI 155.07 (3d ed. 1989) is a correct statement of the law. The Committee on Jury Instructions cited four cases, *Kuhnle, Fochtman, Spring*, and *Sherman*, as support for adding "or obtain" to the pattern instruction on total disability. *See* 6 Wash. Prac., *WPI* 155.07 comment (3d ed. Supp. 1990). By including the phrase "or obtain" in the pattern instruction, the committee followed the direction of precedent. The four cases define total disability as a combination of medical and vocational factors, "the medical *fact* of loss of function and disability, together with the inability to perform and the inability to obtain work as a result of . . . industrial injury". *Fochtman*, 7 Wn. App. at 294.

We note language in a recent opinion from the Court of Appeals conflicts with our holding. In *Graham v. Weyerhaeuser Co.*, 71 Wn. App. 55, 856 P.2d 717 (1993), the Court of Appeals upheld a trial court's refusal to give the claimant's proposed instruction. We do not disagree with the Court of Appeals' deference to the trial court's selection of jury instructions. However, to reach its decision, the Court of Appeals stated: "By definition, general work is generally available on the competitive labor market. Thus, the worker who can perform general work can also obtain it." *Graham*, 71 Wn. App. at 64. The Court of Appeals then concluded, "the words 'or obtain' are superfluous when total

disability is being defined in terms of general work". *Graham*, 71 Wn. App. at 64.

The opinion in *Graham* rests on an incorrect assumption: the general *availability* of light or sedentary jobs in the labor market implies a *particular* injured worker can obtain such a job. This assumption disregards the vocational evidence unique to an individual claimant. By equating the availability of general work with the ability to obtain it, the Court of Appeals in *Graham* presumes the very question the trier of fact must answer — can this claimant obtain work in the competitive labor market. Our cases require the trier of fact to judge in each case whether a particular individual is totally disabled, especially where medical evidence of the injured worker's ability to perform work may conflict with vocational evidence of the worker's inability to obtain work because of the workplace injury. The words "or obtain" under these circumstances are not superfluous.

We find the trial courts in the cases now before the court did not err by choosing the third edition of WPI 155.07 over the second. The Department does not contend the third edition of WPI 155.07 prevented it from arguing its case, nor does it claim the instructions, read as a whole, were misleading. *See Douglas v. Freeman*, 117 Wn.2d 242, 256, 814 P.2d 1160 (1991). Given the ample testimony from medical and vocational experts for both sides on the issue of disability, the addition of the phrase "or obtain" did not prejudice the presentation of the Department's arguments and, hence, was not error. *See State v. Ng*, 110 Wn.2d 32, 41, 750 P.2d 632 (1988).

■ The Department claims in Mr. Taasevigen's case, however, the instruction improperly allowed the jury to consider Mr. Taasevigen's criminal history in reaching its verdict. According to the Department, Mr. Taasevigen's convictions make it difficult for him to obtain many jobs which he can readily perform. We find no error. These criminal convictions are part of Taasevigen's "weakness and strengths, his age, education, training and experience" which define his ability to obtain and perform a job. *Fochtman*, 7 Wn.

App. at 295. Because the convictions are preexisting conditions, they do not disqualify Taasevigen from receiving benefits. *Fochtman*, 7 Wn. App. at 291; *see also Hairston v. Todd Shipyards Corp.*, 849 F.2d 1194 (9th Cir. 1988) (prior criminal conviction part of claimant's background or experience for Longshore and Harbor Workers' Compensation Act disability benefits); *W.F. Dunn, Sr. & Son v. Industrial Comm'n*, 160 Ariz. 343, 773 P.2d 241 (Ct. App. 1989) (prior criminal conviction did not disqualify claimant from workers' compensation).

We hold the use of WPI 155.07 (3d ed. 1989) in each case was not in error.

### CONCLUSION

More than 50 years ago this court recognized the statutory definition of disability was ambiguous, requiring judicial interpretation. Our subsequent opinions have upheld the admission of evidence a claimant could not obtain work because of a work-related injury. We find no error in these cases and affirm the juries' verdicts.

ANDERSEN, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DURHAM, SMITH, JOHNSON, and MADSEN, JJ., concur.